UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ROOSEVELT JENNINGS,

        Plaintiff,                      Civil Action No. 10-cv-12830

        v.                           District Judge Avern Cohn
                                   Magistrate Judge Laurie J. Michelson


COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 12]**

Plaintiff Roosevelt Jennings brings this action pursuant to 42 U.S.C. § 405(g) challenging

the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his

application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")

under the Social Security Act.  Both parties filed summary judgment motions (Dkts. 11, 12), which

are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B) (Dkts. 3, 10).

**I.  RECOMMENDATION**

For the reasons set forth below, this Court finds that the Administrative Law Judge's decision

is supported by substantial evidence.  Accordingly, this Court RECOMMENDS that Plaintiff's

Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be

GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the

Commissioner be AFFIRMED.

## II.  REPORT

### A.  Procedural History

Plaintiff filed an application for disability on May 4, 2005, alleging that he became unable to work on April 6, 2004. (Tr. 40.)   The Commissioner initially denied Plaintiff's disability application on July 29, 2005. (Tr. 34-38.)   Plaintiff then filed a request for a hearing, and on November 27, 2007, he appeared with counsel before Administrative Law Judge ("ALJ") Henry Perez Jr., who considered the case *de novo*.  (Tr. 347-78.)  In a January 29, 2008 decision, the ALJ found that Plaintiff was not disabled.  (Tr. 11-22.)  The ALJ's decision became the final decision of the Commissioner on June 14, 2010 when the Appeals Council denied Plaintiff's request for review. (Tr. 4-7.)  Plaintiff filed this suit on July 19, 2010.

### B.  Background

Plaintiff was 51 years old at the time of the administrative hearing in this matter.  (Tr. 350.) He was 48 on the alleged onset date.  (Tr. 371.)  He has a high school education and an associate's degree in law enforcement.  (Tr. 350.)  He worked as an Assembly Technician at Daimler Chrysler until April 6, 2004.  (Tr. 350-51.)

#### 1.  Plaintiff's Testimony

At the November 27, 2007 hearing before the ALJ, Plaintiff testified regarding his carpal tunnel syndrome ("CTS"), hypertension ("HTN" or "EHTN"), chronic sinusitis, Type II diabetes, and sleep apnea.  (Tr. 353-55.)

With regard to his CTS, Plaintiff experienced numbness and soreness in his hands. (Tr. 357.) He took Vicodin to manage the soreness.  (*Id.*)  He  dropped "stuff all the time."  (Tr. 358-59.) Plaintiff said it was difficult for him to do repetitive activities with his hands.  (*Id.*)

With regard to his hypertension, Plaintiff testified that he suffered from dizziness, chest pains, fatigue and shortness of breath.  (Tr. 359-61.)  He experienced shortness of breath with any exertion or activity.  (Tr. 362.)  He also told the ALJ that he could only walk about a block before needing to take a break.  (*Id.*)

With regard to his sleep apnea, Plaintiff testified that he woke up three or four times a night on a nightly basis.  (Tr. 360.)

With regard to chronic sinusitis, he testified that his "nose [was] constantly running" and he had pain in his eyes.  (Tr. 361.)

Plaintiff also testified that he experienced pain when sitting and could stand only 10 or 15 minutes at a time.  (Tr. 364.) The heaviest item he claimed that he could carry was a bag of groceries. (*Id.*)  He also experienced numbness when trying to use his fingers, and had trouble opening a jar, buttoning, shaving, and dressing at times.  (Tr. 365-66, 368.)  He could do some cleaning, but had friends occasionally help.  (Tr. 368.)

He also testified that he took several naps during the day, and would even have to "pull over on the side of the road and take a nap" when driving.  (Tr. 367.)

### 2. Medical Evidence

Plaintiff's medical evidence is well-documented and comes from numerous sources: Dr. Shin-Young Kang, Dr. Samson P. Samuel, Dr. Jeffery E. Gorosh, Dr. Mark A. Olson, Dr. Matthew Zimmey, Dr. Douglas C. Kubek, Dr. Michael Anthony Merkler, and three state disability examiners. Their respective treatments can be summarized as follows:

### a. Shin-Young Kang, M.D.

Dr. Shin-Young Kang treated Plaintiff's CTS from May 10, 1993 to May 2, 1996. (Tr. 269-80.) He performed surgery on Plaintiff's left wrist on October 18, 1993. (Tr. 276.) On May 2, 1996 Dr. Kang provided the following restrictions for Plaintiff: "restrictions of his hands to light duty, avoiding the use of air tools." (Tr. 269.)

### b. Samson P. Samuel, M.D.

Dr. Samson P. Samuel, M.D. treated Plaintiff's CTS from October 25, 1996 through March 15, 2002. (Tr. 151-175, 262-68.) Dr. Samuel repeatedly recommended cortisone shots and/or surgery for Plaintiff's CTS, and Plaintiff repeatedly refused. (*Id*.) On March 15, 2002, Dr. Samuel provided the following restriction for Plaintiff: "[n]o use of air tools or power tools." (Tr. 151.)

### c. Dr. Jeffrey E. Gorosh

On April 15, 2003, Dr. Gorosh examined Plaintiff for surgery. (Tr. 147-48.) Dr. Gorosh indicated that Dr. Kang and Dr. Samuel treated Plaintiff's CTS previously. (*Id*.) He recommended surgery, which Plaintiff again refused. (*Id*.) He provided the following restrictions for Plaintiff: "I would recommend no use of air or vibratory tools and no high torque tools." (Tr. 148.)

### d. Mark A. Olson, M.D.

Dr. Mark A. Olson performed a number of nerve conduction studies for Plaintiff from May 24, 1993 through September 20, 2004 (Tr. 196-209.) He reported the following impression regarding the September 20, 2004 study:

> The patient continues to show severe conduction abnormalities at the carpal tunnel area on the right, but no evidence for any thenar atrophy is occurring. On the left side, where the patient had carpal tunnel release many years ago, there are residual conduction abnormalities.

(Tr. 196.)

*e. Dr. Douglas C. Kubek and Dr. Michael Anthony Merkler*

Dr. Douglas C. Kubek examined Plaintiff on December 12, 2005 with regard to "chronic rhinosinusitus." (Tr. 283-84.) Dr. Kubek's primary recommendation was that Plaintiff stop smoking. (Tr. 284.) Dr. Kubek also noted Plaintiff's morbid obesity, and suggested that "weight loss would be helpful." (*Id.*)

Dr. Michael Anthony Merkler, M.D. also treated Plaintiff for his sinus issues. (Tr. 311-27.) He noted that Plaintiff was a "very erratic historian." (Tr. 312.) Indeed, Plaintiff told Dr. Merkler that he used to be a technician at Pfizer. (Tr. 327.)

*f. Matthew Zimmey, M.D.*

Dr. Matthew Zimmey at Family Independence Agency examined Plaintiff on April 27, 2005. (Tr. 227-28.) He diagnosed Plaintiff with hypertension ("HTN"), chronic sinusitis, chronic prostatitis, CTS, and hypercholesterolemia. (Tr. 227.) He restricted Plaintiff to the following: 1) He can lift and carry up to fifty pounds; 2) He can stand, walk and sit six hours in an eight hour day; 3) He can use both hands and arms for simple grasping and reaching, but not for pushing, pulling or fine manipulating. (Tr. 228.) Notably, in his Disability Report, Plaintiff indicated that he saw Dr. Zimmey regularly. (Tr. 49.)

*g. State Disability Examinations*

On July 11, 2005, Dr. L. Banerji, M.D., an Internist, examined Plaintiff on behalf of the State Disability Determination Service. (Tr. 229-31.) In the "Personal History" section of his report, Plaintiff indicated that he smoked "20 cigarettes a day for the last 37 years." (Tr. 230.) Dr. Banjeri ultimately diagnosed Plaintiff with CTS in both hands, hypertension, and depression. (Tr. 231.)

On July 21, 2005, Rebecca Lindsey examined Plaintiff to complete a Physical Residual

Functional Capacity Assessment.   (Tr. 82-89.)   Lindsey listed the following as Plaintiff's

impairments: bilateral carpal tunnel syndrome, hypertension and obesity.  (Tr. 82.)  She described

Plaintiff as "partially credible."  (Tr. 87.)  Lindsey recommended the following limitations: 1) No

use of air or power tools; 2) Lifting up to 50 pounds; 3) Stand/walk/sit about 6 of 8 hours; 4) Use

of both arms/hands for repetitive simple grasping and reaching but only occasional pushing and

pulling and handling; and iv) Frequent fingering.  (Tr. 88.)

On July 26, 2005, Psychologist Leonard Balunas completed a Psychiatric Review Technique

form for Plaintiff.  (Tr. 90-103.)   He diagnosed Plaintiff with depression, but with only mild

functional limitations.  (Tr. 100-101.)

### 3. Vocational Expert's Testimony

Vocational Expert ("VE") Pauline Pegram testified at the hearing.  (Tr. 370.)  The ALJ asked

the VE questions based on two different hypotheticals.  (Tr. 370-78.)  The ALJ first asked the VE

to assume the following individual:

> Taking Claimant's age, education and work experience into account
> assume that such a person has an exertion limitation of lifting 20
> pounds occasionally, 10 pounds frequently.  If we impose further
> limitations of standing and sitting, walking six hours, occasional
> pushing and pulling with the bilateral upper extremities, occasional
> handling and frequent fingering with the bilateral upper extremities,
> occasional climbing ladders, ropes and scaffolds, occasional crawling,
> jobs that would avoid moderate exposure to vibration, power hand
> tools, putting this individual at the unskilled level. . . .

(Tr. 372.)

The VE testified that such a hypothetical individual could not perform Plaintiff's past

relevant work as an assembler because of the exertion level.  (*Id*.)  However, such an individual

could perform visual inspection jobs and sorting jobs.  (Tr. 373.)  The VE testified that there are

30,000 of these jobs available in Michigan, and 15,000 in southeast Michigan. (*Id*.) She also

testified that such an individual could perform as an usher, greeter or door attendant. (*Id*.) There

are 6,000 of these jobs available at the light exertional level in Michigan, and 3,000 in southeast

Michigan. (*Id*.)

The ALJ then asked the VE to assume the following second hypothetical individual:

> If I give you limitations of no lifting restrictions established we look
> at jobs that would provide for – allow for a sitting, standing, walking
> six to eight hours, no pushing or pulling with the bilateral upper
> extremities, no fine manipulations with a bilateral upper extremities
> [sic], occasional climbing ladders, ropes and scaffolds, jobs that avoid
> moderate exposure to vibratory hand tools and again putting this
> individual at the unskilled level.

(Tr. 374.)

The VE testified that such a hypothetical individual could not perform Plaintiff's past

relevant work as an assembler because of the exposure to vibratory hand tools. (*Id*.) However, such

an individual could perform the jobs previously mentioned and the following sedentary jobs: ushers,

lobby attendants, information clerks or badge clerks. (Tr. 375.) There are 6,000 of these sedentary

jobs in the state of Michigan, 3,000 in the southeast Michigan area. (*Id*.)

The VE also testified that the Plaintiff could perform work even if the ALJ fully credited

Plaintiff's testimony regarding his exertional impairments. (*Id*.) She testified that Plaintiff could

perform "sedentary work with a sit/stand option." (*Id*.) She stated that lobby attendants, information

clerks and badge checkers can perform with a sit/stand option. (*Id*.) Lastly, the VE testified that the

Plaintiff could perform no work if the ALJ found Plaintiff's testimony regarding his non-exertional

impairments to be credible. (*Id*.) The VE explained that Plaintiff's sleep apnea would "interfere

with a person's ability to maintain absenteeism standards at work." (Tr. 376.) She also testified that

sleeping in the workplace would not be tolerated.  (*Id.*)  Lastly, she testified that Plaintiff's "self-pacing is generally not tolerated in the work place."  (Tr. 376-77.)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of April 6, 2004. (Tr. 16.) At step two, the ALJ found that Plaintiff had the following severe impairments: carpal tunnel syndrome and EHTN. (Tr. 16.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (*Id*.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to perform "unskilled, light work activity with limited climbing of ladders, ropes and scaffolds and crawling." (*Id*.) At step four, the ALJ found that Plaintiff could not perform his past relevant work an assembler. (Tr. 20.) However, at step five the ALJ stated that there were "jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 21.) Therefore, the ALJ held that Plaintiff was not disabled as defined by the Social Security Act. (*Id*.)

### E. Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal

quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an

agency has failed to adhere to its own procedures, we will not remand for further administrative

proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights

because of the agency's procedural lapses." (internal quotation marks omitted)).   Substantial

evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r

of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).   In deciding

whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo,

resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506,

509 (6th Cir. 2007);  *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing

court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, this Court is

limited to an examination of the record and must consider that record as a whole.  *Bass*, 499 F.3d

at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court

"may look to any evidence in the record, regardless of whether it has been cited by the Appeals

Council."  *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this

Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*,

167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly

addressing in his written decision every piece of evidence submitted by a party." (internal quotation

marks omitted)).  If the Commissioner's decision is supported by substantial evidence, "it must be

affirmed even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d

284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545

(6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of

choice within which the decisionmakers can go either way, without interference by the courts"

(internal quotation marks omitted)).

### F. Analysis

#### 1. The ALJ Properly Evaluated Plaintiff's Credibility

In evaluating Plaintiff's credibility, the ALJ stated that his "statements concerning the

intensity, persistence and limiting effects of [his alleged] symptoms [were] not entirely credible."

(Tr. 18.)  Plaintiff argues that the ALJ erred in this assessment. (Dkt. 11, Pl.'s Mot. Summ. J. at 9.)

Pursuant to  20 C.F.R. §§404.1529(c) and 416.929(c), the ALJ must analyze the following

factors when assessing a Plaintiff's credibility: 1) The Plaintiff's daily activities; 2) The location,

duration, frequency and intensity of pain or other symptoms; 3) Precipitating and aggravating factors;

4) The type, dosage, effectiveness, and side effects of any medication Plaintiff takes or has taken to

alleviate pain or other symptoms; 5) Treatment, other than medication, Plaintiff receives or received

for relief of pain or other symptoms; and 6) Any measures Plaintiff uses or has used to relive pain

or other symptoms.

In addition, SSR 96-7p states:

> [T]he adjudicator must consider the entire case record and give
> specific reasons for the weight given to the individual's statements.
> The finding of credibility of an individual's statements cannot be
> based on an intangible or intuitive notion about an individual's
> credibility.  The reasons for the credibility finding must be grounded
> in the evidence and articulated in the determination or decision.  It is
> not sufficient to make a conclusory statement that "the individual's
> allegations have been considered" or that "the allegations are (or are
> not) credible."  (citation omitted.)

11

\* \* \*

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

Notably, courts have found that an ALJ's narrative need not explicitly discuss each of the seven factors identified in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c); instead an ALJ "should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence." *Bowman v. Chater*, 132 F.3d 32 (table), 1997 WL 764419, at *4 (6th Cir. 1997).

Applying these regulations and rulings to this case, the ALJ properly evaluated Plaintiff's credibility. The ALJ considered the entire case record and gave specific reasons for doubting Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms and pain. (Tr. 16-20.) With regard to Plaintiff's daily activities, the ALJ noted that: "The medical record reveals that Claimant is a right handed individual and able to button buttons, tie and untie shoelaces, open doors, write legibly, push and pull, cook and complete household chores." (Tr. 20.) Indeed, Plaintiff's Disability Report indicated that he sometimes has difficulty with buttons and shaving, but otherwise could care for himself. (Tr.45-71, 87.) He also indicated he could cook for himself as long as the recipe does not require a lot of cutting. (*Id*.) He performs his own household chores; although he occasionally needs the help of a friend. (*Id*.) He has no problems standing, walking or sitting. (*Id*.)

With regard to the type, dosage, effectiveness, and side effects of any medication Plaintiff takes or has taken, the ALJ noted that Plaintiff testified to taking Vicodin, which caused him to be fatigued and tired "all the time." (Tr. 19.) Despite the side effects of taking Vicodin, Plaintiff

refused other avenues of treatment.  Indeed, perhaps the biggest factor the ALJ noted in discounting

Plaintiff's credibility was his treatment history, which he called "routine and conservative." (Tr. 19.)

 The ALJ acknowledged that the medical record illustrated that Plaintiff "was advised he should

undergo carpal tunnel release" on the right wrist.  (Tr. 18.)  Yet despite his alleged disabling pain

and numbness, and the nagging side effects of Vicodin, Plaintiff repeatedly refused surgery and

opted to proceed conservatively.  (Tr. 19, 116, 151-70.)  A review of the record indicates that, for

a portion of the time, Plaintiff had an arguably good reason for refusing surgery –  he did not have

medical insurance.  (Tr. 245.)  However, Dr. Samuels recommended surgery as far back as 2002.

(Tr. 116.)  At that time, Plaintiff was still working and  had insurance.  (Tr. 116, 151-70.)  Indeed,

Dr. Samuels recommended surgery on ten different occasions while Plaintiff was still working and

still had insurance.  (Tr. 151-70.)  Moreover, Plaintiff's lack of insurance did not impede him from

getting other treatment for his diabetes, hypertension, and sinusitis.   Pursuant to 20 C.F.R. §

404.1530(b), an ALJ need not hold in favor of a claimant who  does not follow his physician's

prescribed treatment without good reason.  The Sixth Circuit acknowledges that a plaintiff's refusal

to follow prescribed treatment can be evidence supporting an ALJ's assessment that the plaintiff is

not credible.  *Sias v. Secretary of Health & Human Servs*., 861 F.2d 475, 480 (6th Cir. 1988).  In this

case, Plaintiff seems to pick and choose what treatments he will undergo not according to his health,

but rather his preference.  For example, he has been told numerous times to quit smoking and lose

weight, but he ignores this advice.  (Tr. 284, 307, 327.)  These treatment decisions impact disability

findings.  *Id*. at 480.  In short, the ALJ properly evaluated Plaintiff's credibility.  He emphasized

Plaintiff's daily activities, and conservative treatment as two of the main factors that discredited

Plaintiff's testimony as to the intensity, persistence and limiting effects of his symptoms and pain.

20 C.F.R. §§404.1529(c) and 416.929(c).  Moreover, he followed the mandate of 20 C.F.R. §

404.1530(b).    Therefore, this Court recommends that the ALJ's credibility determination be

affirmed.

*2. The ALJ's Failure to Include Certain Limitations in his RFC was Harmless Error*
*where  the VE Testified to a Hypothetical Containing the Relevant Limitations*

"In order for a vocational expert's testimony in response to a hypothetical question to serve

as substantial evidence in support of the conclusion that a claimant can perform other work, the

question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r*

*of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).  Plaintiff argues that the ALJ's hypotheticals did not

accurately portray Plaintiff's physical impairments because the ALJ did not account for the

manipulative limitations included in the Residual Functional Capacity analysis completed by

Rebecca Lindsey. (Dkt. 11, Pl.'s Mot. Summ. J. at 11-13.)  The ALJ's written RFC assessment also

failed to include work-related limitations that were identified by Plaintiff's treating sources.  Neither

error, however, requires remand.

In his January 29, 2008 decision, the ALJ found  that Plaintiff had "the residual functional

capacity to perform unskilled, light work activity with limited climbing of ladders, ropes and

scaffolds and crawling." (Tr. 16.)  The ALJ reasoned that "no treating source or any medical source

opined that Claimant was disabled or that he had any work-related limitations inconsistent with [this

RFC.]" (Tr. 20.)  The latter portion of this statement, however, overlooks certain "tool limitations"

that were indicated by Plaintiff's treating sources.  In 1996, Dr. Kang limited Plaintiff to "light duty,

avoiding the use of air tools." (Tr. 269.)  In 2002, Dr. Samuel restricted him to "[n]o use of air tools

or power tools." (Tr. 151.)  In 2003, Dr. Gorosh restricted him to "no use of air or vibratory tools

and no high torque tools." (Tr. 148.)  Likewise, in  2005, Dr. Zimmey restricted Plaintiff to standing,

walking and sitting six hours in an eight hour day and  using "both hands and arms for simple

grasping and reaching, but neither for pushing, pulling or fine manipulating."  (Tr. 228.)

The ALJ's  failure to include these limitations does not impact his  ultimate finding of "not

disabled" because he asked the VE about much more limited hypothetical individuals at the hearing.

(Tr. 370-78.)   The ALJ first asked the VE to assume the following individual:

> Taking Claimant's age, education and work experience into account
> assume that such a person has an exertion limitation of lifting 20
> pounds occasionally, 10 pounds frequently.  If we impose further
> limitations of standing and sitting, walking six hours, occasional
> pushing and pulling with the bilateral upper extremities, occasional
> handling and frequent fingering with the bilateral upper extremities,
> occasional climbing ladders, ropes and scaffolds, occasional crawling,
> jobs that would avoid moderate exposure to vibration, power hand
> tools, putting this individual at the unskilled level. . . .

(Tr. 372.)

The VE testified that there were available jobs such an individual could perform.   The ALJ

then asked the VE to assume the following second hypothetical individual:

> If I give you limitations of no lifting restrictions established we look
> at jobs that would provide for – allow for a sitting, standing, walking
> six to eight hours, no pushing or pulling with the bilateral upper
> extremities, no fine manipulations with a bilateral upper extremities
> [sic], occasional climbing ladders, ropes and scaffolds, jobs that avoid
> moderate exposure to vibratory hand tools and again putting this
> individual at the unskilled level.

(Tr. 374.)

The VE again testified about the available jobs such an individual  could perform.

These hypotheticals clearly include limitations on the use of vibratory hand tools.  Plaintiff

contends that these hypotheticals still did not accurately portray him  because they "did not list or

include [P]laintiff's documented limitations in ability to handle or finger." (Dkt. 11, Pl. Mot. Summ.

J. at 12.)   The "documented limitations" Plaintiff refers to is an RFC  assessment by Rebecca

15

Lindsey. (*Id*.) Ms. Lindsey found that Plaintiff could perform occasional handling and frequent fingering. (Tr. 85-89.) But these limitations are contained in the ALJ's first hypothetical. (Tr. 372.) Indeed, the most severe handling and fingering restrictions came from Dr. Zimmey, who restricted Plaintiff to no fine manipulating. (Tr. 269, 151, 148, 228.) This limitation is contained in the ALJ's second hypothetical. (Tr. 374.) In response to both hypotheticals, the VE testified that there were still jobs that exist in significant numbers that the Plaintiff could perform. (Tr. 372-75.) Therefore, the ultimate finding of the ALJ regarding disability is supported by substantial evidence, despite any error in his written RFC assessment.

### 3. The Plaintiff Was Not Entitled to a Finding of Disability under the Medical-Vocational Guidelines

When an ALJ reaches Step Five of the sequential analysis mandated by the Act, he or she determines whether the plaintiff can perform any work using the plaintiff's residual functional capacity, age, education and past work experience. 20 C.F.R. § 404.1520(g)(1). The ALJ is aided in making this determination by the grid rules. 20 C.F.R. § 404.1569. Where the characteristics of the claimant *exactly* match the characteristics in one of the grid rules, the grid rules determine whether significant numbers of jobs exist in the regional or national economy for the person to perform. *Id.* However, where a plaintiff's impairments do not precisely match any specific rule, the next step is described in Ruling 83-12:

> Given an individual's particular [residual functional capacity], a [vocational expert] will be able to determine the size of the remaining occupational base, cite specific jobs within the individual's [residual functional capacity], and provide a statement of the incidence of those jobs in the region of the individual's residence or in several regions of the country.

S.S.R. 83-12, 1983 WL 31253, *4 (S.S.A.).

The ALJ followed this process precisely.  He first determined that the Plaintiff had a high school education and could not perform his past work as an assembler.  (Tr. 20.)  He then determined that Plaintiff had the residual functional capacity to perform "unskilled, light work" with a number of restrictions.  (Tr. 16, 370-75.)  Because of these additional restrictions, Plaintiff was not capable of the full range of light work listed by Medical-Vocational Rule 202.13 and 202.20 of Table 2, Appendix2, Part 404, Subpart P, Social Security Regulation No. 4, and, therefore, did not match the grid *exactly*.  (Tr. 18.)[1]

Thus, the ALJ was correct to get the testimony of a Vocational Expert with regard to possible employment.  (Tr. 370-77.)  As detailed above, the ALJ asked the VE to cite specific jobs that the Plaintiff could perform by using a series of hypotheticals.  *Id*.  The VE testified that even given the most limiting restrictions, jobs exist in significant numbers at the state level that Plaintiff could perform.  (Tr. 21, 373.)  Therefore, Plaintiff was not entitled to a finding of disability.

**G.  Conclusion**

For the reasons set forth above, this Court finds that the Administrative Law Judge's decision is supported by substantial evidence.  Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be AFFIRMED.

---

[1]  With regard to age, the ALJ found: "Claimant was born on December 15, 1955, and was forty-nine years old, which is defined as a younger individual, on the alleged disability onset date." (Tr. 20.)  While the ALJ was correct that Plaintiff was born on December 15, 1955 (Tr.40), he was incorrect regarding Plaintiff's age on the alleged onset date.  The Plaintiff was going to be forty-nine on December 15, 2004 – eight months after the alleged onset date.  But because Plaintiff's RFC did not match the grid *exactly*, Plaintiff's age (either on the onset date or the time of the hearing) does not matter.

**III.  FILING OBJECTIONS**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

Date: October 31, 2011

s/Laurie J. Michelson
Laurie J. Michelson
United States Magistrate Judge

*Certificate of Service*

*I hereby certify that a copy of the foregoing document was served on the parties of record on October 31, 2011, by electronic and/or ordinary mail.*

*s/Barbara M. Radke*
*Barbara M. Radke, Judicial Assistant*
*(313) 234-5540*